UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

_____
                                        )
ETHAN THOMAS,                           )
        Plaintiff                       )
                                        )          Civil Action
V.                                      )
                                        )          No. 05-11443-GAO
NEW ENGLAND FAST FERRY OF               )
MASSACHUSETTS, LLC,                     )
NEW ENGLAND FAST FERRY                  )
COMPANY, LLC,  and                      )
INTERLAKE LEASING IV, INC.,             )
        Defendants                      )
_____)

### PLAINTIFF'S MOTION TO STRIKE CERTAIN EXPERT OPINIONS OF HENRY A. MCKENNA, P.E.

NOW COMES the Plaintiff, and states as follows:

This case is a negligence case against the Defendants.  The case arose when the Plaintiff, who was (and is) a dockworker for the Steamship Authority, was hit in the head by the handle of a winch that he was cranking during the docking of the Defendants' ferry, the M/V WHALING CITY EXPRESS, at the Steamship Authority terminal in Vineyard Haven on December 27, 2004.  In a nutshell, the Plaintiff contends that the Defendants' vessel docked negligently, and caused the Plaintiff, who was cranking the winch to raise the ramp that goes from the dock to the vessel, to become injured.  The Defendants contend that their vessel docked properly and that the Plaintiff's injury was caused, among other reasons, because the winch was defective.  They contend that the winch was overloaded and that the pawl (also known as a "dog") that fits in between the teeth of a gear to keep the gear from spinning backwards did not operate properly. See Exhibit A, page 3, for pictures of the winch and the pawl.

The Defendants have retained Henry A. McKenna, P.E., as a liability expert for this case.

Mr. McKenna has offered 8 opinions in his report (which were restated as 6 conclusions).  Mr.

McKenna's report and qualifications are attached as Exhibit A.  The opinions and conclusions

are on pages 4 and 5.  The Plaintiff moves to exclude a number of these opinions and

conclusions for four different reasons.  First, the Plaintiff moves to exclude opinion #8 and

conclusion #6 on the grounds that Mr. McKenna is not qualified by education, training and/or

experience to offer these opinions at trial.  Second, the Plaintiff moves to exclude opinion #3 as

it is not an opinion, but a fact, and should not be presented to the jury as an expert opinion.

Third, the Plaintiff moves to exclude opinions #1 and 4 and conclusions #1 and 2 on the grounds

that these opinions are unreliable under <u>Daubert</u> and <u>Kumho</u>, and because the opinions and

conclusions are insufficient under of Fed.R.Civ.P. 26(a)(2).  Fourth, the Plaintiff moves to

exclude opinion #6 and conclusion #4 as this opinion and conclusion are not relevant and

unfairly prejudicial, given who the parties are and what the legal contentions of the parties are.

I.     <u>LACK OF QUALIFICATIONS</u>

Before a district court may accept an expert opinion, it must first determine that the

expert is qualified.  <u>Correa v. Cruisers, A Division of KCS International, Inc.</u>, 298 F.3d 13, 24

(1st Cir. 2002).  The proponent of the expert opinion bears the burden of proving the expert's

qualifications.  <u>Ralston v. Smith & Nephew Richards, Inc.</u>, 275 F.3d 965, 970 n.4 (10th Cir.

2001).  Under Fed.R.Evid. 702, witnesses may be qualified as experts if they possess the

requisite "knowledge, skill, experience, training or education."  In order to determine whether a

witness is qualified, the Court "must compare the area in which the witness has superior

knowledge, skill or experience or education with the subject matter of the witness' testimony."

<u>Carroll v. Otis Elevator Corp.</u>, 896 F.2nd 210, 212 (7th Cir. 1990).

2

Per his CV (Exhibit A, pp. 10-11), Mr. McKenna is a mechanical engineer and registered professional engineer.  He claimed no expertise in vessel docking operations or ferry operations in general.  Given Mr. McKenna's lack of "knowledge, skill, experience, training or education" in vessel docking operations, he is not qualified to offer opinions about how a ferry should be docked.  Opinion #8 and conclusion #6 state that the ferry was being operated properly and purport to identify the normal procedure for docking a ferry.  He is not qualified to offer this opinion and this conclusion, and he should be barred from doing so at trial.

II.     FACT VERSUS OPINION

Mr. McKenna's opinion #3 is that the Plaintiff "let go of the handle of the winch while the cable was under tension thus causing it to rotate backwards."  This is not an opinion; it is a fact.  That is exactly what happened, and that is not in dispute.  If the Plaintiff had not let go of the handle, the handle would not have rotated backwards and hit him.  If the cable was not under tension when the Plaintiff let go of the handle, the handle would not have rotated backwards and hit the Plaintiff.  These issues cannot reasonably be contested.  Accordingly, opinion #3 is not an "opinion" that will be of assistance to the jury to help it understand the evidence.  It should thus be inadmissible pursuant to Fed.R.Evid. 702.  Moreover, allowing Mr. McKenna to phrase this fact as an opinion when it is not will unfairly burnish his credentials, and, as such, will be unfairly prejudicial to the Plaintiff.

III.    LACK OF SUFFICIENCY AND RELIABILITY

A.      The law

Daubert requires that "the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion," Ruiz-Troche

3

v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998), and that the expert's opinions

for litigation employ "the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167,

1176 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995)

("the experts must explain precisely how they went about reaching their conclusions"). The

District Court must determine "whether the reasoning or methodology underlying the testimony

is scientifically valid and … whether that reasoning or methodology properly can be applied to

the facts in issue. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-593, 113

S.Ct. 2786, 2796 (1993). Daubert "identified four [non-exclusive] factors that may assist a trial

court in determining the admissibility of an expert's testimony," testing [i.e., "whether the

expert's theory can be challenged in some objective sense, or whether it is instead simply a

subjective, conclusory approach that cannot reasonably be assessed for reliability"], peer review,

rate of error, and "acceptance within the relevant discipline." United States v. Mooney, 315 F.3d

54, 62 (1st Cir. 2002). If an expert's opinions are based solely on experience, he "must explain

how that experience leads to the conclusion reached, why that experience is a sufficient basis for

the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 Advisory

Committee Notes.

Fed.R.Civ.P. 26(a)(2) requires a "detailed and complete" statement of the expert's

opinions, along with the bases and reasons therefor. Salgado v. General Motors Corporation,

150 F.3d 735, 741 n.6 (7th Cir. 1998). The report (or disclosure) "must include 'how' and 'why'

the expert reached a particular result, not merely the expert's conclusory opinions." Id. (citation

omitted). The "purpose of a 'detailed and complete' expert report . . . is, in part, to minimize the

expense of deposing experts, and to . . . prevent an ambush at trial." <u>Ortiz-Lopez v. Sociedad</u> <u>Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico</u>, 248 F.3d 29, 35 (1st Cir. 2001).  An expert opinion that contains "nothing but conclusions - no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected" is insufficient.  <u>Hayes v. Douglas</u> <u>Dynamics, Inc.</u>, 8 F.3d 88, 92 (1st Cir. 1993), <u>cert</u>. <u>den.</u>, 511 U.S. 1126, 114 S.Ct. 2133 (1994), <u>quoting</u> <u>Mid-State Fertilizer Co. v. Exchange National Bank of Chicago</u>, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."); <u>Torres Otero v. Hospital General Menonita</u>, 115 F.Supp.2d 253, 261 (D. Puerto Rico 2000) (failure to disclose reasoning or methodology deprives court of a "basis for evaluating whether that reasoning or methodology is scientifically valid").

B.     The opinions

Mr. McKenna's opinion #1 and conclusion #1 are that the winch was overloaded, and that he estimates that the Plaintiff may have been exerting as much as 140 pounds of force on the handle.  Determining the amount of force that the Plaintiff was exerting on the handle is a matter of engineering calculations.  This force can be calculated to the ounce, assuming that the engineer has the proper data with which to make the calculation.  Rule 26(a)(2) requires Mr. McKenna to disclose the calculations that he used to arrive at this opinion, but he disclosed no calculations.  In construction, when an engineer is asked for an opinion on something calculable, he does not give an estimate.  Either he does the calculations or he does not.  If Mr. McKenna did not perform the calculations in this case, then his methodology was not scientifically reliable, and he failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, <u>supra</u>.  If he did perform the calculations, then he

5

should not have an estimate, but a precise opinion. In any event, failing to show one's work renders the opinion nothing but a bottom line. Hayes, supra; Mid-State Fertilizer, supra; Torres Otero, supra. For these reasons, opinion #1 and conclusion #1 should be stricken.

In opinion #4 and conclusion #2, Mr. McKenna stated that the operator (the Plaintiff) "was in an unsafe position by facing the winch handle with the winch to the side." Mr. McKenna identified the factual basis of his opinions in section II on page 1 of his report. Item 2 was his site visit. Items 3 and 4 were his experience. Item 1 referred to the documents listed in section VI, References. This should actually be section V, and is found on page 6. In section V, Mr. McKenna listed 6 documents. Documents 1, 2, and 6 are manuals and drawings that relate only to the winch in general. Documents 3, 4, and 5 relate to this case, and are attached as Exhibits B, C, and D. None of these 3 documents indicates what position the Plaintiff was standing in before he got hit. Nor does section I, Introduction, of the report explain where Mr. McKenna got information of how the Plaintiff was standing before the accident. Accordingly, since there is no factual basis for Mr. McKenna's opinion that the Plaintiff was in an unsafe position before he got hit, the opinion is not reliable under Daubert, and must be excluded.

IV.    RELEVANCY AND UNFAIR PREJUDICE

The Plaintiff moves to exclude opinion #6 and conclusion #4 on the grounds that they have no relevance to the issues presented in this case, and because such evidence would be unfairly prejudicial to the Plaintiff. In that opinion and conclusion, Mr. McKenna stated that a winch with a load operated brake should have been used, and that such a winch would have prevented the accident. While he did not refer to the Steamship Authority in this opinion, he obviously has the opinion that the Steamship Authority should have employed a different winch

on the dock.  The Steamship Authority is not a party in this case.  What it should have done is

not relevant to a case where the issues are the Defendants' negligence and the Plaintiff's

comparative negligence.  This opinion is unfairly prejudicial to the Plaintiff because it would

improperly shift the jury's focus from the real issues on liability in the case – i.e., the negligence

of the Defendants and the comparative negligence, if any, of the Plaintiff.

WHEREFORE, the Plaintiff respectfully requests that this Court exclude the following

opinions and conclusions of Henry McKenna: opinions #1,3,4,6, and 8 and conclusions #1,2,4,

and 6.

<div style="margin-left: 50%;">

Respectfully submitted for the
the Plaintiff, by his attorney,


/s/ David J. Berg, Esq.
David J. Berg, Esq.
Latti & Anderson LLP
30-31 Union Wharf
Boston, MA 02109
(617) 523-1000

</div>

<div style="text-align: center;">CERTIFICATE OF SERVICE</div>

I hereby certify that on this date, I electronically filed the within document with the Clerk
of the Court using the CM/ECF system which will send notification of such filing(s) to all
counsel of record.

<div style="margin-left: 50%;">

/s/ David J. Berg, Esq.
David J. Berg, Esq.
Latti & Anderson LLP
30-31 Union Wharf
Boston, MA 02109
617-523-1000

</div>

Dated: May 25, 2007

# EXPERT REPORT

## REGARDING

# LITIGATION
# THOMAS V. NEW ENGLAND FAST FERRY

Prepared for

**CLINTON & MUZYKA, p.c.**
One Washington Mall, Suite 1400
Boston, Massachusetts 02108

Prepared by

**Henry A. McKenna, P.E.**
**Tension Technology International, Inc**
35 Hubbard Road
Weston, Massachusetts 02493
Tel: (781) 235-1129    Fax: (781) 235-1129
e-mail: mckenna@tensiontech.com

April 26, 2007

## I. INTRODUCTION

It is the understanding of the author that the plaintiff, Ethan Thomas, was injured when struck by a winch handle that he was using to raise a transfer bridge used for moving automobiles from the dock an auto ferry. The dock is located on Nantucket Island. The accident occurred on December 27, 2004 during inclement winter weather.

The plaintiff claims that a ferry, the M/V Whaling City Express, operated by New England Fast Ferry, struck the transfer bridge while he was turning the handle on the winch used to raise the bridge. He claims that the impact caused the winch handle to jerk which apparently caused him to release his grip on the handle. This resulted in it suddenly turning in reverse, hitting him in the head, and causing injury.

The winch was heavily loaded because it was being used to left the entire weight of the bridge. This was because the counterweights which compensate for the weight had bottomed out and no longer contributed to the lifting of the bridge. Another indication that the winch was overloaded was that the electric motor that normally powered the winch had stalled due to excessive load. The manual operation with the crank was required to lift the bridge as it could create more tension than the electric drive. The force required to be exerted by the operator was very large..

The author was retained as an expert witness by the law firm of Clinton and Muzyka, P.C. and was requested to determine the cause of the accident.

## II. BASIS OF OPINIONS

The sources of data and basis for analysis that were used to form the opinions expressed in this report are presented below.

1. Information found in the documents listed in Section VI, References.
2. Author's visit to the accident site on November 3, 2006 and photographs taken at that time.
3. Author's experience with the science of mechanical engineering including extensive experience as a designer and user of winches.
4. Author's experience with marine vessel operations, including docking and mooring.

An understanding of the winch and its operation is essential for an understanding of this case. This is provided below.

- The winch is Wintech Model HM 12. The specifications are provided as Attachment 1. It is shown below in Figure 1.



Figure 1. Hand operated spur gear winch, 5 ton maximum load.

I

- The winch is installed on the pier side of the transfer bridge as seen in Figure 2.



Figure 2. Winch installed on side of bridge

- The operator should stand to the side facing the winch when turning the handle as seen in Figure 3. From Reference 2, page 7. "Paying Out or Hauling In with Handle".



Figure 3. Operator standing to side, facing winch while turning crank according to standard operating procedure

- A winch of this type will turn in reverse if the handle is released due to the tension in the cable unless a means is provided to prevent it. For this winch, back rotation is stopped by a pawl (jamming device) that engages the teeth on the outer gear. See Figures 4 and 5. It is essential that the pawl always work properly. If the operator releases the handle while the cable is under tension,

the winch will turn backward and the handle will rotate at a high rate. Should the pawl not engage, there is a danger of striking the operator if in line with the handle.

The pawl is forced down by a spring. It pivots on a lubricated pin and must be free to turn.



Figure 4. Side view of winch with outer gear shown.
Arrows point to the pawl.



Figure 5. Close view of pawl engaged against a gear tooth.
Arrow points to the gear tooth engaged by the pawl.

3

- The operator should not stand in front of the handle with the winch to the side. If the pawl should fail to engage and the handle turns backward there is a significant chance for injury. The incorrect operating position is shown in Figure 6. Exhibit 3, which predates this accident, specifies that the operator must face the winch. See Figure 6.



Figure 6. Operator facing handle and to the side of the winch.

- Winches used as a hoist (lifting applications), as in this case, should have a load actuated brake in addition to a pawl type device. This is a standard design practice for hoists. Wintech, the manufacturer of the winch offers such a brake as an option to this winch as seen in Exhibit 1 where it states, "Optional disc brake is available to automatically hold the rated load in lifting applications".

## III. STATEMENT OF OPINIONS

The opinions formed in this case are listed below and include statements of the facts and analysis that were use to support these opinions.

1. It is my opinion that the winch was overloaded and required excessive force on the handle to lift the transfer bridge. Using data provided by References 1, 4 and 6, it is estimated that the operator may have been required to exert as much as 140lbs at the handle to lift the bridge. This placed the operator in an unsafe situation as it was difficult to control the winch handle.

2. It is my opinion that the winch, designed for 5 tons, was overloaded as it was unable to lift the bridge with the electric motor.

3. It is my opinion that the operator let go of the handle of the winch while the cable was under tension thus causing it to rotate backwards.

4. The operator was in an unsafe position by facing the winch handle with the winch to the side. There is considerable risk of injury if the handle should be released. The safer position is facing the end of the winch with the handle in front of the operator so that backward rotation would not strike the body or head.

4

5. It is my opinion that the pawl did not operate properly. If the pawl was working properly the winch handle could not turn backwards. The failure of the pawl could have been caused by a broken spring, binding on the pivot or if the operator was holding the pawl open. In addition, it is contended that deicer had been used to clear the gear teeth of ice. If any single gear tooth was filled with ice, it could cause the pawl to skip.

6. It is may opinion that a winch with a load operated brake that would have prevented backward rotation should have been used. This would have prevented the accident.

7. It is my opinion that if the ferry moved the bridge, it did so by having the bow raise up from under the bridge; this being caused by a wave or swell after the bow had moved under the bridge. This is supported by the statement of Mr. Rick McElhinney (Reference 5). Lifting the end of the bridge would reduce the tension on the cable going to the winch which would, in turn, lessen the force on the handle .The operator would suddenly find it easier to rotate the handle. This is contradictory to the plaintiff's claim that the cable tightened.

   This opinion is supported by the following analysis:
   • The transfer bridge weighs 40,000 pounds (20 tons) (Reference 4). The bridge is an extremely strong and rigid structure, and firmly fixed to the dock by large hinges. If the ferry had struck the bridge head on or on the side with enough impact to upset the winch operator there would have been considerable damage to the vessel and/or the bridge, but none was reported.
   • A front end or side impact may vibrate the bridge but not move the bridge in a way that would have affected the operation of the winch handle.
   • The winch is located near the dock end of the bridge where motion would be minimal due being away from the impact point and its secure mounting.
   • If the bow of the ferry lifted the end of the bridge, it is possible to have done so with no damage to the vessel as was reported
   • If the bow of the ferry lifted the bridge, it is important to note that this would not be a dynamic event, as the reaction of a vessel to a wave surge is relatively slow.

8. It is my opinion that the ferry was being operated properly. It is normal procedure to move the bow under the transfer bridge and nose up to bumpers on the slip before the bridge is lowered onto the deck.

## IV.CONCLUSION
The conclusions of the author are:
1. The winch was overloaded which made it very difficult to control the handle.
2. The operator was standing in an unsafe location in violation of procedures when a less dangerous position was present
3. The pawl on the winch was defective as demonstrated by its failure to hold the load when the winch started to turn backwards.
4. A winch with a load operated brake should have been used.
5. The ferry could only have lifted the bridge which would reduce the cable tension temporarily. The affect on the operator should not have been sufficient to cause him to release the handle.
6. The ferry was operating in the normal docking mode.

## V. REFERENCES

1. Specifications for Wintech 5 ton winch Model HM 12
2. Parts, Operation and Maintenance Manual of Hand Winch Models, Form MHD56031, Edition 3, dated October 1996.
3. Memo from Mark Rozum, Director of Terminal Operations, Woods Hole, Martha's Vinyard and Nantucket Steamship Authority, dated Novermber 23, 2004.
4. E-mail from  Bill Clouter of the Steamship Authority to Phil Parent on 3/23/2005
5. Written statement of Rick McElhinney of the Steamship Authority, witness to the accident.
6. Drawing No. TW-012-1, "50 ft Transfer Bridge, by Fay, Stafford & Klondike, Inc. designers of the transfer bridge.

## VI. EXHIBITS

Attachment 1.  HM 12 5 ton winch specifications

## VII. QUALIFICATIONS OF AUTHOR

The author by way of education and experience is qualified to opine on textile fiber and fiber rope structures. He has worked extensively with fiber rope technology for about 30 years. Details of these qualifications are provided in Attachment 2.

## VIII. COMPENSATION

The author is employed by Tension Technology International, Inc.  For services as an expert witness, this company charges as follows:

$140.00 per hour for office or work site locations
$140.00 per hour for standby or travel time with an 8-hour maximum.
$180.00 per hour for testimony at trial or depositions with an 8 hour minimum.
Travel and living expenses at cost.

## IX. PUBLICATIONS OR PAPERS BY AUTHOR

Fiber Ropes for Ocean Engineering in the 21st Century, American Society of Civil Engineers, Civil Engineering in the Oceans Conference, College Station, Texas, November 1992 (co-author)

The Polyester Rope Taut Leg Mooring Concept, Offshore Technology Conference, Paper No. OTC 7708, Houston TX, May 1995

Polyester Fibers Engineered for High Performance, Sea Technology Magazine, July 1995 (co-author)

Mooring Line Termination Technology, Sea Technology Magazine, July 1996

Riser Protection Nets - Design considerations, Marine Technology Society, Oceans 2000 Conference, Providence RI, September 2000.

Training Program for Alaska Ferry System, Cordage News, May/June 2001

Handbook of Fibre Rope Technology, H.A. Mckenna, J.W.H. Hearle, N. ,O'Hear; Woodhead Publishing, Cambridge, England, April 2004.

Evaluation of New and Used Fiber Ropes, Marine Technology Society, Oceans 2005 Conference, Washington, DC, September 2005.

Fiber Rope and Fishing, Marine Technology Society Journal, Columbia MD, Fall 2006.

## X. CASE LIST

The author has testified in the following cases over the previous 8 years.

JAMES JUSTICE vs. UNITED STATES OF AMERICA (Corps of Engineers)
   Date: April 1999 (Trial)
   Jurisdiction: US District Court, Charleston, WV

KELLY SPOONTS vs. NATIONAL OILWELL LIMITED PARTNERSHIP, ET AL
   Date: December 8, 2000 (Deposition)
   Jurisdiction: US District Court for Alaska (Case no. A97-0455 CV)

BENEWAY VS. SUPERWINCH
Date: November 2002 (Trial)
Jurisdiction: New York District Court, Utica, New York

The author reserves the right to modify his opinions should additional information become available.

By: _Henry A. McKenna_                              Date: _4/26/07_

Henry A. McKenna, P.E.

## ATTACHMENT 1



**W**INTECH. ... *"A Winch For Every Application"*

5319 Shreveport - Blanchard Hwy.     Phone          Fax
Shreveport, LA 71107                 (888) 946-8325  (318) 929-1245

### Spur - Gear Series 2 & 5 Ton

*Taking The Winch Industry By Storm*

**Standard Features**

- Cast steel drum and ring gear
- Steel load bearing components, cast steel frames
- Replaceable bronze bushings
- One piece fully adjustable 14" long steel operating handle with pinion
- Spring loaded holding dog with release handle
- Hand operated, adjustable holding brake
- Easy free spooling
- Two speed gear change offers fast cable take up and easier winching



5 Ton HM 12

*Optional disc brake handle incorporates a "Weston" style load brake to automatically hold the rated load in lifting applications*

**Optional Features**

| Description | LM | HM |
|---|---|---|
| 28" diameter hand wheel | 1590-2 | 1580-1 |
| Hand wheel for units with Disc brake handle (SH91) | 3628 | 3628 |
| Extended shaft pinion 17/16" X 12" | 2833 | 991 |
| Power Drive Pinion ** | 1042 | 1848 |
| Gear covers | 250-B | 249 |
| Disc brake handle | 3670 | 4877 |
| Marine 812 top coat | | |
| Reverse dog assembly | | |
| Drum divider flange | | |

### Designed for Marine and Industrial Use

Spur gear series 2 and 5 Ton Specifications

| Model No. | Capacity 1st Layer US Tons* | Gear Ratio | Drum Capacities (ft) | | | | | | Shipping wt (lbs) |
|---|---|---|---|---|---|---|---|---|---|
| | | | 1/4" | 5/16" | 3/8" | 7/16" | 1/2" | 5/8" | |
| LM6 LM6W | 2 | 4 1/24 1 | 279 | 182 | 133 | 97 | 69 | - | 63 65 |
| LM10 LM10W | 2 | 4 1/24 1 | 464 | 300 | 222 | 151 | 111 | - | 77 88 |
| LM16 LM16W | 3 | 4 1/24 1 | 742 | 480 | 355 | 227 | 177 | - | 93 104 |
| HM8 HM8W | 5 | 4 1/24 1 | - | - | 206 | 234 | 230 | 131 | 171 172 |
| HM12 HM12W | 6 | 4 1/24 1 | - | - | 385 | 425 | 330 | 190 | 131 151 |
| HM16 HM16W | 5 | 4 1/24 1 | - | - | 513 | 566 | 440 | 347 | 147 150 |
| HM24 HM24W | 7 | 4 1/24 1 | - | - | 745 | 850 | 660 | 571 | 153 174 |

*Models are not rated for power operation*

** Warning: A power driven pinion is intended to only free reel in slack rope by power and should never be used to power raise or load.

*Warning: Do not exceed rated capacities and never attempt to lift or support a load exceeding the rated capacity or attempt to support a load by locking the pawls.

"W" at the end of the model no. indicates units equipped with a hand wheel. Allow 2 for the shaft diameter.



**WINTECH** ... *"A Winch For Every Application"*

5319 Shreveport - Blanchard Hwy,
Shreveport, LA 71107

Phone
(888) 946-8325

Fax
(318) 929-1245

## Spur - Gear Series 2 & 5 Ton

2 Ton LM

5 Ton HM

### Superior Value - Wintech Reliability / Quality

*The LM and HM Series*
*"All Steel" hand winches*
*are designed for marine duty*
*and industrial use.*

Wintech Winch Cables Available On All Models

NOTE Dimensions are subject to change. Please contact factory for certified prints.

Spur gear series 2 and 5 Ton Dimensions

| Model No. | A In. | B In. | C In. | D In. | E In. |
|---|---|---|---|---|---|
| LM4 LM6W | 6 | 5 7/8 | 16 3/4 | 12 1/4 | 14 |
| LM10 LM10W | 10 | 7 3/4 | 14 5/8 | 16 1/4 | 18 |
| LM16 LM16W | 16 | 10 3/4 | 20 5/8 | 22 1/4 | 24 |
| HM8 HM8W | 8 | 7 7/8 | 13 7/8 | 15 3/8 | 17 3/4 |
| HM12 HM12W | 12 | 9 1/4 | 17 3/4 | 19 1/4 | 21 1/4 |
| HM16 HM16W | 16 | 11 1/2 | 22 1/4 | 23 3/4 | 25 3/4 |
| HM24 HM24W | 24 | 16 3/4 | 30 1/4 | 31 7/8 | 33 3/4 |

9

## ATTACHMENT 2

## CURRICULUM VITAE

### HENRY A. McKENNA, P.E.

## EDUCATION
- Bachelor of science degree in mechanical engineering, University of Santa Clara, California, 1955
- Graduate study in mechanics, structures and materials, University of Santa Clara, California, 1962 to 1965

## PROFESSIONAL
- Registered professional engineer (California)
- Member American Society of Mechanical Engineers (member B30-9 Committee; this body sets American national standards for lifting sling safety)
- Former Chairman, Technical Committee, Cordage Institute; currently active member of Technical Committee.
- Member Marine Technology Society
- Member Associated Wire Rope Fabricators (fiber rope and vehicle cargo tie-down subcommittees)
- Advisor to or trade groups setting performance or safety standards for rope applications.
- Author of papers on rope technology and rope applications. Lead author of a historical and technical text on fiber rope.

## ACADEME
- University instructor in engineering - mechanics, material science and machine design (5 years) (University of Santa Clara, California)

## INDUSTRIAL
- Manager of engineering for large synthetic rope engineering and fabrication organization.  Directed design, R&D and quality assurance for rope systems, production and application engineering (9 years)
- Division manager for a company that designed, manufactured and sold a variety of advanced marine products and technical services including mooring systems and deck machinery (3 years)
- Project manager for large marine systems for transportation, underwater operations, offshore oil and defense (3 years)
- Chief engineer for firm producing winching machinery for ropes and cables for marine, utility and construction industries (4 years)
- Project engineer for missile handling system for large defense contractor (3 years)

## CURRENT POSITION

- President, Tension Technology International, Inc. (16 years)
- Active consultant to manufacturers and users of synthetic fiber ropes and cables
- Provides expert analysis and testimony for accidents and litigation involving fiber ropes, cables, rigging equipment and rope related machinery

## AREAS OF EXPERTISE

- Cordage, ropes and cables of natural and synthetic fibers; wire rope and chain.
- Rope and cable applications for industrial, utility, construction, manufacturing and marine industries
- Offshore oil and maritime operations, especially towing, mooring and handling systems.
- System and machinery design.
- Management of mooring system design and research projects for the offshore oil industry.
- Ocean engineering
- Engineering documentation and quality assurance programs
- Machine design, particularly: winches, cable handling equipment, hoisting equipment, hydraulic drives & controls, gear drives.
- Materials experience: textiles, fibers, plastic foams, polyurethanes, heat treatable and corrosion resistant alloys, gearing.

## GENERAL SUMMARY

Extensive experience is found in the following areas:

- expertise in all types of fiber rope for applications in consumer, commercial, industrial, recreational, military, and marine areas;
- rope and sling terminations and other fittings;
- rope manufacturing techniques and quality assurance;
- fiber rope industry sales and distribution practices;
- technology of fiber materials;
- mechanical engineering, particularly in machinery and rope systems design;
- accident investigations involving ropes and rope related machinery;
- frequently testified at trials and depositions as expert witness in rope related matters;
- author of technical papers and an engineering handbook on fiber rope technology;
- advised commercial vessel operators and US Navy on deck machinery and fittings.

November 23, 2004

To:    All Terminal Workers

From:  Director of Terminal Operations

RE:    Transfer Bridge Procedures


Once the vessel has arrived in the slip, the two cables are to be attached on the hooks of the bow of the vessel by the vessel employees.  Once the cables are securely attached and the stern line is secure, the vessel personnel will communicate with the dockworker to crank in the cable with the winch to secure the vessel.  The winch should always be operated from a side position, never in front or behind the handle of the winch.

The dockworker will now lower the transfer bridge on to the vessel with the hand held motor control.  This step insures that the weight of the transfer bridge and vehicles is shared between the vessel and the dock.  There should be enough slack to allow minimal movement of the transfer bridge that occurs when during the off loading and loading of vehicles from the vessel.

When the vessel is ready to depart, a terminal worker is to put the net up across the transfer bridge, and no one is to go onto the ramp except authorized Steamship Authority personnel.  Now, a dockworker is to take the slack out of the transfer bridge cable.  This now puts all of the transfer bridges weight on the dock.  Once the Boatswain or other vessel personnel gives the order to "let go", the dockworker releases the cables on the winch and the vessel crew detach the cables from the vessel deck hooks.  A vessel worker will instruct the dockworker to remove the stern line from the dock and return it to the vessel crew.  The transfer bridge is to be raised just enough for the vessel to clear, 1-2 inches and the transfer bridge is never to exceed going over the height of the vessel's rub rail.  The transfer bridge is not to be raised until all people are clear. Once the vessel is clear of the transfer bridge, the bridge can be raised safely.

If you have any questions or concerns please contact the appropriate Terminal Manager.  Thank you in advance for your cooperation and attention to this matter.


Mark Rozum

Cc:    Phil Parent
       Greg Gifford

## Phil Parent

**From:**    bcloutier [bcloutier@steamshipauthority.com]
**Sent:**    Wednesday, March 23, 2005 9:52 AM
**To:**    'Phil Parent'
**Subject:** RE: Transfer Bridge Information

Phil:

The 30' bridges have two counterweights per bridge each weighing 3.5 Tons.  The total counter weight per bridge is 7 Tons.  The 50' bridges at VHT have two counterweights each weighing 8.5 Tons; resulting in a total counterweight of 17 Tons.

These weights are approximate values.

Bill

> -----Original Message-----
> **From:** Phil Parent [mailto:pparent@steamshipauthority.com]
> **Sent:** Wednesday, March 23, 2005 6:54 AM
> **To:** 'bcloutier'; ssayers@steamshipauthority.com
> **Subject:** RE: Transfer Bridge Information
>
> Thanks Bill, I know you are very busy. Could you also tell me how much the counter weights themselves weigh?  Phil
>
> **From:** bcloutier [mailto:bcloutier@steamshipauthority.com]
> **Sent:** Tuesday, March 22, 2005 4:23 PM
> **To:** ssayers@steamshipauthority.com
> **Cc:** pparent@steamshipauthority.com
> **Subject:** Transfer Bridge Information
>
> Steve:
>
> To date we have changed out the counter weight cables on two slips and a third is in progress.  VHT Slip # 2, WH Slip # 2, are complete, and WH Slip # 1 is being done.  We are changing the counter weight connection fittings to allow for a shorter cable which in turn will allow the transfer bridge to be raised higher.  The 50 foot transfer bridges at VHT weigh approximately 36 Tons and the shorter transfer bridges weigh approximately 20 Tons.  The manual winches for raising the transfer bridges are rated for five tons. The counter weights offset the gross weight of the transfer bridges so that the electric or manual winches do not have to raise the full load of the bridge.
>
> Please call me if you need additional information.
>
> Regards,
> Bill

Rick McElhinney          1/7/05          FAX
                                          508-540-1643

My Memory of the Event that took Place on 12/27/04

1) Snow Storm High winds white out conditions

2) only one Boat had left V.H dram, 6:00am

3) Fast Ferry trying to dock slip #2 Ramp not high enough

4) All outside employee's taking turns to RAISE Ramp By
   hand crank (Back Left side of slip)

5) I thought Ramp was high enough turned to Lock down
   Fast Ferry Bump Ramp

6) Turned to Tell Ethan & Dennis Ramp was not high Enough
   Saw Ethan FACE down on Cement (10' From crank)

7) Fast Ferry Forced its way under Ramp Pads

8) Ethan wakes up Jumps to Feet Says Richard I'm hurt I need
   to go to hospital starts to Run towards car,

9) Dennis Leads Ethan to his pickup Truck

10) I try to call office to dial 911 But messed diMet

11) By time I got ticket office Ethan & Denass had Already
    Passed Stop & shop in Truck.