UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-11443-GAO

ETHAN THOMAS
    Plaintiff,

vs.

NEW ENGLAND FAST FERRY OF
MASSACHUSETTS, LLC
    Defendant.

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE REGARDING ALLEGED REPAIRS OF WINCH

Now come the defendant, New England Fast Ferry of Massachusetts, LLC, in the above entitled action, by and through its undersigned counsel, and file its Opposition to plaintiff's Motion in Limine Regarding Alleged Repairs of Winch.

As grounds in support of its Opposition, the defendant submits the following for this Honorable Court's consideration.

### BACKGROUND

This is a maritime cause of action for personal injuries brought by Ethan Thomas. The plaintiff maintains that he was injured while working as a dockworker on Slip No. 2 at The Woods Hole, Martha's Vineyard and Nantucket Steamship Authority's [hereinafter referred to as "the Steamship Authority"] Vineyard Haven Ferry Terminal on December 27, 2004. The plaintiff alleges that he sustained a head injury

2

when he participated in the raising of a transfer bridge by turning its manual winch handle.  As the plaintiff tried to turn the handle, it recoiled, and struck him in the head.

After the plaintiff's accident, his employer, The Steamship Authority, conducted an investigation into its cause[s].  On March 23, 2005, Mark K. Rozum, Director of Terminals and Parking Facilities at the Steamship Authority, circulated an internal memorandum, which he authored and summarized the investigation's findings, including "Post-Incident Remedial Actions."  A copy of Mr. Rozum's Memorandum is enclosed herewith as *Exhibit 'A'*.  On July 27, 2006, the parties' counsel deposed Mr. Rozum and he confirmed that he took the investigation upon himself and his memorandum memorialized his investigation and its findings.  A copy of page 32 of Mr. Rozum's deposition testimony is enclosed herewith as *Exhibit 'B'*.

Within the memorandum, Mr. Rozum attributes the plaintiff's accident to the decision to attempt to raise the transfer bridge higher after its counterweights had bottomed out.  *See page 7 of Exhibit 'A'*.  His investigation also discovered reported problems with one or more of the springs in the winch at Slip No. 2 before the plaintiff's accident. *See page 7 of Exhibit 'A'*. On January 20, 2005, the cabling and counterweight mechanisms on Slip No. 2 in Vineyard Haven

3

were adjusted to allow for a shorter cable which in turn allowed the transfer bridge to be raised higher …. *See page* 7 *of Exhibit 'A'*.  Mr. Rozum also advised that all other transfer bridges at The Steamship Authority's terminals be inspected and repaired as necessary.  *See page* 7 *of Exhibit 'A'*.

On May 8, 2007, the parties' counsel deposed Carl R. Walker, Director of Engineering and Maintenance at the Steamship Authority.  Mr. Walker testified that his department participated in the investigation into the operation of manual winches on the Steamship Authority's transfer bridges.  He recalled the investigation examined when the manual winch was used, to what extent the Steamship Authority used the manual winch, what were the current guidelines, and what should be the future guidelines.  New guidelines were adopted and Mr. Rozum's office released the new operational procedures to the Steamship Authority's employees.  Mr. Walker confirmed that Mr. Rozum's memorandum encompassed the new procedures concerning the use of the manual winches.  A copy of pages 34 through 36 of Mr. Walker's deposition testimony is enclosed herewith as *Exhibit 'C'*.

4

## ARGUMENT

Federal Rule of Evidence 407 does not apply to evidence of subsequent remedial measures taken by a non-party.[1] *Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3RD Cir 2004), *Espeaignnette v. Gene Tierney Co., Inc.*, 43 F.3d 1, 5 (1st Cir 1994). There is no rationale for excluding third party subsequent repairs under Rule 407 because the social policy which forms its primary basis is not furthered. *Raymond v. Raymond*, 938 F.2d 1518, 1524 (1st Cir 1991). Here, it is evident from a review of Mr. Rozum's memorandum and subsequent deposition testimony that the Steamship Authority conducted an investigation into the cause[s] of the plaintiff's accident, produced a report concerning its investigation, implemented repairs of the subject winch, modified the subject transfer bridge cables and also inspected and repaired other winches at various transfer bridges throughout its several port locations. In addition, the Steamship Authority implemented new procedures addressing the appropriate and safe use of the manual winches at its several port locations. As the plaintiff's employer and a non-party to this action, the Steamship Authority was

---

1. Fed.R.Evid. 407 - When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if

5

not inhibited by taking these remedial measures by the threat
of a potential lawsuit.  Accordingly, Fed.R.Evid. 407 does
not bar the admission of any evidence concerning the
Steamship Authority's efforts to address the problems with
its manual winches and transfer bridges.

Evidence of subsequent remedial measures may be excluded
under Federal Rule of Evidence 403.[2]  Here, Mr. Rozum's
memorandum memorialized the Steamship Authority's
investigation into the cause[s] of the plaintiff's accident.
*See* **Exhibit 'B'** and **Exhibit 'C'**.  The Steamship Authority
controls the maintenance and repair of the winches and
transfer bridges, including the manual winch and its handle
that struck the plaintiff in the head.  The Steamship
Authority conducted the only known investigation into the
cause[s] of the plaintiff's accident.  The results of its
investigation, including the subsequent remedial repairs
preformed throughout its port locations, are very important
for the jury to consider within its evaluation into the
cause[s] of the plaintiff's accident.  Defendant submits that
any evidence of The Steamship Authority's subsequent remedial
repairs is more probative of the cause of the plaintiff's

---

controverted, or impeachment.
2.  Fed.R.Evid. 403 - Although relevant, evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, waste of time, or needless presentation of
cumulative evidence.

6

accident than prejudicial to his burden of proof that the defendant was negligent. Accordingly, such evidence should be submitted and weighed by the jury during its deliberations.

**WHEREFORE**, the defendant prays that this Honorable Court deny the plaintiff's Motion in Limine Regarding Alleged Repairs of Winch and allow the jury to receive evidence concerning the subsequent remedial repairs preformed by The Steamship Authority throughout its port locations as evidence that the condition of the subject winch and transfer bridge contributed to the cause of the plaintiff's alleged injuries.

Respectfully submitted,

By Its Counsel
**CLINTON & MUZYKA, P.C**


"/s/Thomas J. Muzyka"
**Thomas J. Muzyka**
**BBO NO: 365540**
**Terence G. Kenneally**
**BBO NO: 642124**
One Washington Mall
Suite 1400
Boston, MA  02108
(617) 723-9165

Dated:  At Boston, MA  July 12, 2007

# EXHIBIT   A



# Woods Hole, Martha's Vineyard and Nantucket Steamship Authority

March 23, 2005

TO:        Wayne C. Lamson
           General Manager

FROM:      Mark K. Rozum
           Director of Terminals and Parking Facilities

SUBJECT:   December 27, 2004 Accident at the Vineyard Haven
           Terminal involving Terminal Employee Ethan Thomas



EXHIBIT
1
7-27-06

## PURPOSE:

At approximately 8:00 a.m. on Monday, December 27, 2004, there was an accident on the transfer bridge of Slip 2 at the Vineyard Haven terminal which resulted in an Authority terminal employee, Ethan Thomas, being injured. After conducting an investigation of the incident, the purpose of this memorandum is to describe how the accident occurred and to identify measures that have been taken to prevent this type of accident from happening again.

## BACKGROUND:

By way of background, as you are well aware, the Authority's statutory purpose is to provide adequate transportation of persons and necessaries of life for the islands of Nantucket and Martha's Vineyard by operating and maintaining a boat line for the carriage of passengers, automobiles and trucks between the Massachusetts mainland and the Islands. The Authority provides ferry service between Woods Hole (on the mainland) and Vineyard Haven (on Martha's Vineyard), as well as between Woods Hole and Oak Bluffs (on Martha's Vineyard) during the summer. The Authority also provides ferry service between Hyannis (on the mainland) and Nantucket.

The Authority's fleet currently is comprised of ten vessels: four of the vessels are larger passenger/vehicle ferries, each of which is around 200 to 240 feet long, has a vehicle capacity equivalent to between 46 and 60 passenger vehicle spaces on an enclosed freight deck, and can

carry between 800 and 1,400 passengers; another four of the vessels are smaller freight boats, each of which is around 185 to 240 feet long, has a vehicle capacity equivalent to between 19 and 60 passenger vehicle spaces on an open freight deck, and can carry between 149 and 250 passengers; one vessel is a high-speed passenger-only catamaran, which can carry up to 299 passengers; and one vessel is a conventional monohull passenger-only ferry, which can carry up to 640 passengers.

When sailing from a ferry terminal, a vessel docks in a slip at the terminal from which it loads and off-loads the vehicles (and passengers) it carries. Once a vessel is nestled into the slip, a "transfer bridge" is lowered from the wharf and placed on the vessel's freight deck (at either the bow or the stern of the vessel). After the transfer bridge is secured, vehicles can then be driven on or off the vessel, and passengers can also board and disembark the vessel this way, although the Authority also uses side-loading passenger ramps for passengers on its larger passenger/vehicle ferries.

Each transfer bridge is secured to the wharf at a fixed location. The other end of the transfer bridge is placed on each vessel's freight deck at different elevations, depending upon how high the vessel's freeboard is above the water line (which varies from vessel to vessel and also varies at different times with the same vessel depending upon the aggregate weight of the automobiles and trucks being carried), and how high the water is at the time (which varies depending upon the tides). Accordingly, each transfer bridge has a mechanism by which its waterside end can be raised and lowered so that it can be placed and secured on a vessel's freight deck within a reasonable range of how high (or low) the freight deck is then above (or below) the wharf. The angle of the transfer bridge from the wharf to the vessel then differs depending upon the height of the vessel's freight deck in relation to the wharf at the time the transfer bridge is secured.

Each transfer bridge is attached to two cables (one on each side of the bridge) that allow it to be raised or lowered. The cables are hung from a gallows-type structure over the bridge so that the cables hang vertically from the sides of the structure. The other end of each cable is attached to a counterweight which allows the cable to be moved over the structure (thereby raising or lowering the transfer bridge) by means of a winch. As the cable is moved over the structure to lower the transfer bridge, the counterweight is raised, and vice versa. Generally, an electric motor is used to operate the winch, but the winch also has a hand crank which can be used in the event of a loss of electric power. The winch rotates a gear-like spool that has a "dog" which falls between the gear's teeth in order to lock the gear in place, which in turn locks the cable (and hence the transfer bridge) in place.

One limitation on how high a transfer bridge can be raised, and how low the transfer bridge can be lowered, is the length of the cables. Generally, a transfer bridge with shorter cables will be limited in how low it can be lowered, as it cannot be lowered any further once the counterweights are raised to the top of the gallows-type structure, and counterweights attached to shorter cables will reach the top of the structure sooner than those attached to longer cables. Conversely, longer cables will limit how high a transfer bridge can be raised, because it cannot be raised any higher once the counterweights "bottom out" or, in other words, are resting on the

ground, and counterweights attached to longer cables will "bottom out" sooner than those attached to shorter cables.

Generally, the range of how high and how low a transfer bridge may be raised and lowered is ten feet, and the cables and counterweights are positioned so that the waterside end of the bridge can be raised to five feet above horizontal, and lowered to five feet below horizontal. After the counterweights bottom out, a transfer bridge can only be raised higher by having the winch hold the entire weight of the transfer bridge itself, which it is not designed to do. Nor can the electric motor provide enough power to lift the transfer bridge by itself, without having the weight of the counterweights balance the weight of the bridge.

In this regard, the weights of the Authority's transfer bridges vary due to their different lengths. In Woods Hole, the two operational slips have 30-foot transfer bridges, each of which weighs approximately 20 tons. In Vineyard Haven, the two slips have 50-foot transfer bridges, each of which weighs approximately 36 tons. The winches for raising and lowering the transfer bridges are rated for only five tons. (The counterweights and the pulley mechanism offset the gross weight of the transfer bridges so that the electrical or manual winches do not have to raise the full load of the bridge.)

On November 23, 2004, I issued a memorandum to all of the Authority's terminal workers regarding safe transfer bridge procedures. The memorandum provided the following instructions:

"Once the vessel has arrived in the slip, the two cables are to be attached on the hooks of the bow of the vessel by the vessel employees. Once the cables are securely attached and the stern line is secure, the vessel personnel will communicate with the dockworker to crank in the cable with the winch to secure the vessel.[1] The winch should always be operated from a side position, never in front or behind the handle of the winch.

"The dockworker will now lower the transfer bridge on to the vessel with the hand held motor control. This step insures that the weight of the transfer bridge and vehicles is shared between the vessel and the dock. There should be enough slack to allow minimal movement of the transfer bridge that occurs when during the off loading and loading of vehicles from the vessel.

"When the vessel is ready to depart, a terminal worker is to put the net up across the transfer bridge, and no one is to go onto the ramp except authorized Steamship Authority personnel. Now, a dockworker is to take the slack out of the transfer bridge cable. This now puts all of the transfer bridges weight on the dock. Once

---

[1]    These are different cables than the cables holding up the transfer bridge referred to earlier in this memorandum. These other cables are attached to the end of the transfer bridge and then wrapped around hooks on the vessel. Different winches than the one referred to earlier in this memorandum are then used to tighten the cables so that the vessel is secured to the transfer bridge.

the Boatswain or other vessel personnel gives the order to 'let go', the dock-worker releases the cables on the winch and the vessel crew detach the cables from the vessel deck hooks. A vessel worker will instruct the dockworker to remove the stern line from the dock and return it to the vessel crew. The transfer bridge is to be raised just enough for the vessel to clear, 1-2 inches and the transfer bridge is never to exceed going over the height of the vessel's rub rail. The transfer bridge is not to be raised until all people are clear. Once the vessel is clear of the transfer bridge, the bridge can be raised safely."

## VINEYARD HAVEN TERMINAL OPERATIONS:

The Vineyard Haven terminal has two operational slips. During the Authority's Fall Schedule in December 2004, two of the Authority's larger passenger/vehicle ferries, the *Nantucket* and the *Islander*, as well as one of the Authority's freight boats, the *Sankaty*, provided service from that terminal. Both the *Nantucket* and the *Islander* generally dock in Slip 2, while the Authority's freight boats generally dock in Slip 1. Since October 2004, the Authority also has been providing dockage at the Vineyard Haven terminal for a private ferry operator, New England Fast Ferry of Massachusetts, LLC ("NEFF"), which operates a high-speed passenger-only ferry service between New Bedford and Martha's Vineyard. During this time period, NEFF operates three round trips between New Bedford and Vineyard Haven (with a fourth trip Fridays through Sundays) with the catamaran *Whaling City Express* that has a capacity of 149 passengers. The *Whaling City Express* also generally docks in Slip 1.

The transfer bridge in Slip 1 can be raised higher than the transfer bridge in Slip 2 because of its particular configuration of cables and counterweights (as described at pp. 2-3, *supra*). This ability to raise the transfer bridge higher in Slip 1 also helps in the docking of the *Whaling City Express*, which has a higher freeboard than any of the Authority's vessels used on the Woods Hole-Martha's Vineyard route. Once the *Whaling City Express* is docked in the slip, its passengers disembark directly from the vessel's bow onto the transfer bridge, and then new passengers board the vessel directly from the bridge onto the vessel's bow.

At the end of each day, the *Islander* berths overnight in Slip 1 (its first departure in the morning is at 7:00 a.m.), while the *Nantucket* berths overnight in Slip 2 (its first departure in the morning is at 6:00 a.m.). The freight boat arrives for the first time at Vineyard Haven from Woods Hole each day shortly after 7:00 a.m., usually docking in Slip 1 after the *Islander* has left.

## THE INCIDENT:

During the evening of December 26, 2004 and into the morning of December 27, 2004, approximately twelve inches of snow fell on Martha's Vineyard. The snow and ice from the storm made conditions very slippery, and a liquid de-icing agent was used on the pavement, transfer bridge, and some of the apparatus that was icing up, including the winch for the transfer bridge of Slip 2. During the morning of December 27, 2004, it was cold (in the low 20s) and particularly windy with gusts around 30 miles per hour. There was also a high tide that morning, and the full moon that day combined with the north-northwest winds blowing directly into the slips at the Vineyard Haven terminal caused the high tide to be even higher than usual at that location.

On December 27, 2004, the severe weather conditions caused the *Islander* to cancel its first two scheduled trips in the morning and remain tied up in Slip 1.[2] Therefore, when the *Whaling City Express* arrived that morning on its first scheduled trip to Vineyard Haven shortly before 8:00 a.m., it had to be docked in Slip 2. In addition, the extreme high tide required the transfer bridge in Slip 2 to be raised even higher for the *Whaling City Express* than normal.

Vineyard Haven terminal employees used the winch's electric motor to raise the transfer bridge in Slip 2 as high as it could go. At this position, the transfer bridge's counterweights were bottomed out. However, the bridge was still not high enough to dock the *Whaling City Express* which was being buffeted about in the slip by the wind and the sea.

Instead of turning the vessel away, the employees (including Ethan Thomas) inserted the hand crank into the winch and started taking turns manually cranking the winch to raise the transfer bridge even higher, even though all of the weight of the bridge was then on the winch itself. Because of the freezing conditions, the employees also sprayed the winch from time to time with a de-icing liquid. After the bridge had been raised manually higher, the vessel attempted to dock again, but the bridge was still not high enough.

At this point, Mr. Thomas returned to the winch and began to raise the bridge even higher. It appears that the *Whaling City Express*, which was being buffeted by the wind and sea, may then have bumped against the bridge. This momentarily would have taken the weight of the transfer bridge off of the winch and then placed it immediately back on the winch with even greater force. This apparently occurred just as Mr. Thomas was cranking the winch (thereby leaving it momentarily unlocked), and the force of the transfer bridge on the cables caused the handle of the crank to spin backwards. Because Mr. Thomas was cranking the winch from behind the winch's handle, instead of from a side position, when the handle spun backwards it hit

---

[2]     The *Islander* also had cancelled its last round trip the previous night due to the weather. Also on December 27, 2004, although the *Nantucket* made its 6:00 a.m. scheduled sailing from Vineyard Haven to Woods Hole, it cancelled all of its subsequent trips until the afternoon, similarly due to the weather. The *Sankaty* did not leave Woods Hole on its first trip that day until 7:45 a.m., arriving in Vineyard Haven for the first time at around 8:30 in the morning.

Mr. Thomas on his forehead, knocking him to the ground. He then got up, staggered, said that he had been hurt and needed to go to the hospital, and started running towards his car. He was then driven to the hospital by co-worker Dennis Vogel while the other employees docked the boat.[3]

## POST-INCIDENT REMEDIAL ACTIONS:

The basic cause of the accident was the decision to attempt to raise the transfer bridge even higher after its counterweights had bottomed out. I since have learned that Authority employees in the past have raised transfer bridges in this manner in order to dock vessels during extreme tide conditions, but to the best of my knowledge no one previously had ever gotten hurt as a result of this practice. Nevertheless, I immediately instructed all of the Terminal Managers that under no circumstances were employees to raise transfer bridges any higher after the counterweights bottom out. On January 13, 2005, I then issued a memorandum to all of the Terminal Managers confirming my instructions regarding safety procedures for the manual cranking of transfer bridges. The memorandum instructed the Terminal Managers as follows:

"This update is in addition to the memo sent out on November 23, 2004 regarding the procedures for operating the transfer bridge. All cranks are to be checked on a daily basis. Any problems are to be reported to the maintenance department immediately.

"When operating the transfer bridge, once the bridge is raised to a point where the counter weights have bottomed out, the bridge is not to be raised any further. This includes both manually and by the electronic controls. The manual cranks were not designed to handle the total weight of the transfer bridge.

"If you have any questions or concerns please contact me immediately. It is imperative that you ensure that all of your employees are aware and understand this. Thank you in advance for your cooperation and attention to this matter."

I also am in the process of revising the form of "Daily Turnover Notes" used by the Terminal Managers to include a line expressly requiring them to state that each winch's crank has been checked that day, and I am also requiring written acknowledgments from all of the Authority's terminal employees at each terminal that they have been provided with copies of my November 23, 2004 and January 13, 2005 memoranda, and that they have been instructed, when using a winch's hand crank, to operate the handle from a side position (and never from behind or in front of the handle) and not to raise any transfer bridge any higher after the counterweights have bottomed out.

---

[3]     Mr. Thomas since has returned to work. His first day back after the accident was Sunday, February 27, 2005.

After the incident, there were also reports that one or more employees at the Vineyard Haven terminal previously had noticed problems with one or more of the springs in the winch at Slip 2, but it is unclear whether any problems with those springs contributed to the incident. Nevertheless, a maintenance employee was dispatched to each of the Authority's terminals to conduct a survey of all of the transfer bridge winches. The maintenance employees then inspected and replaced all of the mechanisms in each transfer bridge's winch as warranted.

More importantly, on January 20, 2005, the cabling and counterweight mechanisms on Slip 2 at the Vineyard Haven terminal were adjusted to allow for a shorter cable which in turn now allow the transfer bridge to be raised higher by the electric motor before the counterweights bottom out. The Authority's other terminals also had their slips evaluated for the same purpose. The Nantucket Terminal Manager has reported that they had never encountered any need to raise a transfer bridge to a higher height than that achieved by the electric motor. The Hyannis Terminal Manager similarly has reported that they do not have this problem due to the fact that the transfer bridges at that terminal are longer than at the Authority's other terminals. By contrast, due to the shorter transfer bridges at the Woods Hole terminal, we decided to adjust the cabling and counterweight mechanisms for both operational slips there. The adjustments already have been accomplished for Slip 2 (which is currently the only slip being used by the Authority's vessels), and are being performed on Slip 1 during the ongoing maintenance work on that slip. The adjustments for Slip 1 will be completed before that slip is used once again to dock the Authority's vessels. The Oak Bluffs terminal is currently closed, but similar adjustments will be made to its slip's cabling and counterweight mechanisms before that terminal opens in mid-May 2005.[4]

Finally, NEFF has been instructed to bring a gangway on board during extreme high tides. Once the transfer bridge has been raised to its maximum safe height, it will not be raised any higher, and the gangway will be placed from the vessel over the ramp for the passengers to board and disembark the vessel.

---

[4]     We also investigated whether we could replace the handles of the winches with a mechanism that is in the shape of a wheel, which would only spin backwards instead of recoiling backwards in the event of a sudden force on the cable. However, we are informed that the only model of this device available is too large for the Authority's operations, and its necessary placement on the inside edge of the transfer bridge would interfere with the Authority's normal vehicle loading and unloading process.

# EXHIBIT  B

```
                                    VOLUME:  I
                                    PAGES:  1 - 72
                                    EXHIBITS:  1 - 13
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

ETHAN THOMAS
     Plaintiff

                         CIVIL ACTION

     Vs.                  NO. 05-11443-GAO

NEW ENGLAND FAST FERRY OF
MASSACHUSETTS, LLC, NEW ENGLAND
FAST FERRY COMPANY, LLC, AND
INTERLAKE LEASING IV, INC
     Defendants

- - - - - - - - - - - - - - -x

                        DEPOSITION OF MARK ROZUM

taken on behalf of the Plaintiff pursuant to the Federal

Rules of Civil Procedure, before Carole M. Wallace,

Certified Shorthand Reporter and Notary Public, at the

offices of Latti & Anderson, LLP, 30-31 Union Wharf,

Boston, Massachusetts   02109, on Thursday, July 27,

2006, commencing at 10:10 a.m.

1   doctored or cleansed or cleaned or changed in any

2   way?

3  A   No.

4  Q   So they are a fair and accurate representation of

5   what was --

6  A   Yes.

7  Q   -- on the video when you looked at it?

8  A   Yes.

9  Q   With regard to the incident, you performed an

10   investigation which is or which was memorialized in

11   Exhibit 7, your March 23, 2005, memorandum, is that

12   correct?

13  A   Correct.

14  Q   Who asked you to do that examination?

15  A   I took it upon myself.

16  Q   On the date of the injury who was the terminal agent

17   and the -- is it the terminal manager?

18  A   The terminal agent was Clark.

19  Q   How long has he been an employee of the Steamship

20   Authority, approximately?

21  A   Over twenty years.

22  Q   Who was the terminal manager?

23  A   She was off that day, I believe.  Bridget Tobin.

24  Q   Excuse me?

EXHIBIT   C

*Whaling City*

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No.:

05-11443-GAO

Volume I
Pages 1 to 45

RECEIVED

JUN 1 2 2007

CLINTON & MUZYKA, P.C.

---------------------------------X

ETHAN THOMAS,
        Plaintiff,

            -vs-

NEW ENGLAND FAST FERRY OF
MASSACHUSETTS, LLC, NEW ENGLAND
FAST FERRY COMPANY, LLC,
and INTERLAKE LEASING IV, INC.,
        Defendants.
---------------------------------X

*    *    *    *    *    *    *

        DEPOSITION of CARL WALKER, 30(b)6), called
as a witness by and on behalf of the Defendants,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before Lisa
L. Gross, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at the offices of Woods Hole
Steamship Authority, 1 Cowdry Road, Woods Hole,
Massachusetts, on Tuesday, May 8, 2007, commencing
at 11:00 a.m.

# ORIGINAL

1    New England Fast Ferry concerning the

2    operation or the maintenance of the winch?

3        A.  I don't believe I had any direct

4    correspondence with New England Fast Ferry.

5        Q.  And how about the manufacturer of the

6    winch, did you have any conversations with

7    Wind Tech with regards to the operation or

8    the maintenance of the winch?

9        A.  I did not.

10       Q.  Do you know if there were any -- what

11   warranty claims were filed against the

12   manufacturer of the winch out there in

13   Vineyard Haven terminal?

14       A.  I'm not aware of any warranty claims.

15       Q.  Okay.  Do you know an employee named

16   Manny Somoano?

17       A.  I know a man who works in the Vineyard

18   Haven terminal, I don't know if -- any idea

19   if that's his last name.

20       Q.  And in terms of procedures, if Mr. --

21   or -- back up.

22              If an employee at the Vineyard

23    Haven terminal observed a problem with the

24    winch on the transfer bridges, and, again, in

1    Vineyard Haven terminal, their responsibility

2    is to report that to the terminal manager; is

3    that correct?

4        A.  The agent on duty, or the terminal

5    manager.

6        Q.  Okay.

7        A.  Terminal manager is not there at all

8    hours of operation.

9        Q.  Okay.  Did your department conduct any

10   investigation into the use or operation of

11   the manual winches on the Steamship

12   Authorities transfer bridges as a result of

13   the plaintiff's accident?

14       A.  We did.

15       Q.  And what was the scope of that

16   investigation?

17       A.  What we were looking at, is when they

18   were using the manual winch, to what extent

19   they were using the manual winch and what

20   were the current guidelines and what should

21   be the future guidelines.

22       Q.  Okay.  And are there now new

23   guidelines or -- strike that.  After the

24   investigation was concluded, were new

1    guidelines adopted?

2    A.  Guidelines were adopted.  I don't know

3    if they were old guidelines, I didn't know

4    -- look into the old guidelines at that

5    point.

6         I think that -- so we did, through

7    Marks's office -- again, not myself, and I

8    don't know if I have even seen the final

9    procedure, they did put out a new operation

10   procedures.

11   Q.  So you participated in Mr. Rozen's

12   investigation?

13   A.  Correct.

14   Q.  And contributed to that, and then he

15   produced a memorandum which encompasses the

16   scope of the investigation; is that right?

17   A.  I don't know that it encompasses the

18   scope -- it encompasses a new procedure.

19   Q.  Okay.  Fair enough.

20   A.  Okay.

21   Q.  With regards to the procedure -- I

22   would back up.

23        Six months before the plaintiff's

24   incident, so let's say June of 2004, do you